**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

CYRIL J. ZARA, JR.                                                      CIVIL ACTION

VERSUS                                                                  NO. 09-3919

JACK STRAIN, JR., SHERIFF                                               SECTION "S" (1)
OF PARISH OF ST. TAMMANY, ET AL.


<u>**ORDER AND REASONS**</u>

Plaintiff, Cyril J. Zara, Jr., filed this civil action asserting claims arising from his incarceration within the St. Tammany Parish Jail.  The sole remaining defendant is Sheriff Rodney J. Strain, Jr., who was sued in only his official capacity.[1]  In this lawsuit, plaintiff claims that his rights were violated under both federal and state law by the failure to provide him with adequate medical care and to protect him from harm.

Sheriff Strain has filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56,[2] which plaintiff has opposed.[3]  The parties consented to the jurisdiction of the undersigned United States Magistrate Judge.[4]

---

[1]    Rec. Doc. 1, p. 4; <u>see also</u> Rec. Doc. 44, p. 1.  Plaintiff also originally named  St. Tammany Parish and the St. Tammany Parish Department of Corrections as additional defendants.  However, he subsequently voluntarily dismissed those defendants.  Rec. Doc. 7.

[2]    Rec. Doc. 18; <u>see also</u> Rec. Docs. 35 and 45.

[3]    Rec. Docs. 28, 37, and 44.

[4]    Rec. Doc. 10.

<u>I.  Facts Alleged</u>

Plaintiff alleges that, at the time of his incarceration within the St. Tammany Parish Jail, he suffered from "diabetes and other medical conditions."[5] He further alleges that, although his chronic medical problems were known to the jail staff, he was not provided with adequate medical care for those problems.

Plaintiff also alleges that he was attacked and injured by other inmates.  Specifically, he alleges that he was attacked by inmate James Sylve on June 14, 2008.  Plaintiff's injuries in that attack included a bloody nose and red marks on his chest.  Additionally, in an unrelated incident, he was allegedly attacked by inmate Joseph Monnie on June 21, 2008.  In that attack, plaintiff sustained a blow to the left eye and temple, resulting in "moderate purple swelling" and a "sub-conjunctival hemorrhage."  He alleges that he was not afforded prompt and adequate medical treatment for the injuries suffered in those attacks.

On or about July 1, 2008, plaintiff was taken to the emergency room of the St. Tammany Parish Hospital and thereafter transferred to Oschner Hospital.  He ultimately underwent surgery for a subdural hematoma.  While hospitalized, he was released from custody.

<u>II.  Summary Judgment Standards</u>

The principal purpose of Rule 56 is to isolate and dispose of factually unsupported claims. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986).  In reviewing a motion for summary judgment, the Court may grant the motion when no genuine issue of material fact exists and the mover is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  There is no "genuine issue"

---

[5]   Rec. Doc. 1, p. 5.

when the record taken as a whole could not lead a rational trier of fact to find for the nonmovant. Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

"Procedurally, the party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." Taita Chemical Co., Ltd. v. Westlake Styrene Corp., 246 F.3d 377, 385 (5th Cir. 2001) (quotation marks and brackets omitted). The party opposing summary judgment must then "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed.R.Civ.P. 56); see also Provident Life and Accident Ins. Co. v. Goel, 274 F.3d 984, 991 (5th Cir. 2001). The Court has no duty to search the record for evidence to support a party's opposition to summary judgment; rather, "[t]he party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which the evidence supports his or her claim." Ragas v. Tennessee Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir. 1998). Conclusory statements, speculation, and unsubstantiated assertions are not competent summary judgment evidence and will not suffice to defeat a properly supported motion for summary judgment. Id.; Douglass v. United Servs. Auto Ass'n, 79 F.3d 1415, 1429 (5th Cir. 1996).

For the following reasons, the Court finds that the defendant's motion for summary judgment should be granted. However, while the merit of the defendant's motion is apparent, the Court expressly notes that the conduct of defense counsel in this proceeding has been appallingly

3

unprofessional.[6]  Defense counsel's efforts to thwart discovery unnecessarily prolonged resolution of this matter and was costly in terms of both time and money to plaintiff and the Court. **Accordingly, if plaintiff is inclined to pursue sanctions for discovery abuses, the Court will entertain such a motion.  Any such motion should be filed within twenty-one days and  be properly supported by billing records showing the additional expenses incurred as a result of the abuses.**

### III.  Federal Law Claims

As noted, plaintiff has sued Sheriff Strain in only his official capacity.  "Official capacity suits generally represent another way of pleading an action against an entity of which an officer is an agent."  Burge v. Parish of St. Tammany, 187 F.3d 452, 466 (5th Cir. 1999).  Accordingly, an official-capacity claim against Sheriff Strain is in reality a claim against the local governmental entity he serves.  The United States Fifth Circuit Court of Appeals has explained:

> In order to hold a municipality or a local government unit liable under Section 1983 for the misconduct of one of its employees, a plaintiff must initially allege that an official policy or custom was a cause in fact of the deprivation of rights inflicted.  To satisfy the cause in fact requirement, a plaintiff must allege that the custom or policy served as a moving force behind the constitutional violation at issue or that [his] injuries resulted from the execution of an official policy or custom.  The description of a policy or custom and its relationship to the underlying constitutional violation, moreover, cannot be conclusory; it must contain specific facts.

Spiller v. City of Texas City, Police Department, 130 F.3d 162, 167 (5th Cir. 1997) (quotation marks, brackets, and citations omitted).  Further, "[a] plaintiff may not infer a policy merely because

---

[6]     The Court is referring specifically to the conduct of attorney R. Bradley Lewis, who recently retired and withdrew from his representation of Sheriff Strain.  The torturous path of plaintiff's discovery efforts and attempts to secure discovery from Mr. Lewis is recounted in detail in the Memorandum in Opposition to Motion for Summary Judgment. Rec. Doc. 28, pp. 3-6.

harm resulted from some interaction with a governmental entity." Colle v. Brazos County, Texas, 981 F.2d 237, 245 (5th Cir. 1993); see also Wetzel v. Penzato, Civ. Action No. 09-7211, 2009 WL 5125465, at *3 (E.D. La. Dec. 23, 2009).  Rather, he must *identify* the policy or custom which allegedly caused the deprivation of his constitutional rights.  See, e.g., Murray v. Town of Mansura, 76 Fed. App'x 547, 549 (5th Cir. 2003); Treece v. Louisiana, 74 Fed. App'x 315, 316 (5th Cir. 2003); Wetzel, 2009 WL 5125465, at *3.

The parties agree that Sheriff Strain is the final policymaker for the purposes of plaintiff's official-capacity claims.  Indeed, it is clear that a Louisiana parish sheriff in the final policymaker when it comes to the management of the parish jails, including as to matters concerning the management of healthcare in those jails.  See, e.g., Quatroy v. Jefferson Parish Sheriff's Office, Civ. Action Nos. 04-451 and 04-1425, 2009 WL 1380196 , at *5-6 (E.D. La. May 14, 2009).

## A.  Medical Claim

In the instant case, plaintiff has not properly identified a policy or custom of Sheriff Strain which caused the allegedly inadequate medical care.  On the contrary, plaintiff's own evidence attached to his opposition demonstrates that Sheriff Strain has implemented no policies or customs to curtail medical care within the jail or to interfere in any way with the healthcare decisions of the medical staff.  For example, Warden Gregory Longino stated in his deposition:  "The Medical Director actually makes all medical decisions in the St. Tammany Parish jail."[7]  Likewise, in his deposition, Dr. Inglese, who was the jail medical director at the time of plaintiff's incarceration, confirmed that fact and further noted that Sheriff Strain had never once interfered with medical

---

[7]   Rec. Doc. 44-2, p. 18.

decisions or rationed care due to cost or other factors.  For example, Dr. Inglese stated:  "I have

never gone to Sheriff Strain and asked him for something, no matter how expensive it was, that

would improve health care, and have him say no, in the history of my entire tenure there ....  [H]e

has never once said no."[8]  He further stated:  "[Sheriff Strain] doesn't interfere with medical at all.

...  I have never had Sheriff Strain tell me to do anything with any patient, ever."[9]  No evidence to

contrary has been presented.

       Further, Dr. Inglese also flatly rejected any suggestion that there is any policy or custom to

understaff the medical unit.  He stated:  "I think they are the most staffed jail per inmate in the entire

State of Louisiana, including [Orleans Parish Prison].  Our ratio of our physicians to inmates, our

ratio of licensed nurses to inmates probably – definitely exceed any that I know of."[10]  He continued:

> I haven't calculated it out, but we have 16 nurses; one, two, three full-time
> physicians; two part-time psychiatrists, all for 1,100 inmates.
> Now, in private practice, a general internist will have impaneled somewhere
> between 2,000 and 3,000 patients per internist; we have three for 1,200.  We
> have sick call seven days a week now.  We have medical staff on site 24 hours a day.  We
> have a physician on site seven days a week; and a physician on call 24 hours a day,
> seven days a week.  I think we are staffed stronger than any jail in Louisiana.[11]

Again, no evidence to contrary has been presented.

       Moreover, even if plaintiff had identified a policy or custom which adversely affected his

medical care, which he has not, his federal medical claim would still fail.  This is true because

---

[8]    Rec. Doc. 44-3, p. 10.

[9]    Rec. Doc. 44-3, p. 32.

[10]    Rec. Doc. 44-3, p. 11.

[11]    Rec. Doc. 44-3, p. 11.

plaintiff's medical care not only met but clearly exceeded constitutional standards for the following reasons.

With respect to claims such as this, it must first be remembered what the federal constitution does *not* require.

First, the federal constitution does not require that inmates receive optimal care.  The fact that an inmate's medical treatment "may not have been the best money could buy" is simply insufficient to establish a federal violation.  Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992); see also Gobert v. Caldwell, 463 F.3d 339, 345 n.12 (5th Cir. 2006) ("deliberate indifference exists wholly independent of an optimal standard of care"); McMahon v. Beard, 583 F.2d 172, 174 (5th Cir. 1978) (the applicable legal standard is not whether an inmate was provided the "optimum" or "best" medical care available).

Second, federal constitutional protections are not violated simply because an inmate's medical treatment was unsuccessful or because pain persisted despite treatment.  Gobert, 463 F.3d at 346; Williams v. Chief of Medical Operations, Tarrant County Jail, No. 94-10115, 1994 WL 733493, at *2 (5th Cir. Dec. 27, 1994); Kron v. Tanner, Civ. Action No. 10-518, 2010 WL 3199854, at *7 (E.D. La. May 19, 2010), adopted, 2010 WL 3171040 (E.D. La. Aug. 6, 2010).

Third, the federal constitution does not require even that an inmate's medical care be free from negligence or medical malpractice.  Hall v. Thomas, 190 F.3d 693, 697-98 (5th Cir. 1999); see also Kelly v. Gusman, Civ. Action No. 07-611, 2007 WL 2007992, at *4 (E.D. La. July 5, 2007); Cerna v. Texas Tech Medical Staff, No. 2:03-CV-0322, 2004 WL 42602, at *2 (N.D. Tex. Jan. 7, 2004).  Rather, claims of negligence or malpractice present issues of state law for state courts, not

federal constitutional issues for a federal court.  See Estelle v. Gamble, 429 U.S. 97, 107 (1976);

Cerna, 2004 WL 42602, at *2.

On the contrary, an inmate's federal constitutional right to medical care is extremely limited.

Specifically, regardless of whether he is a pretrial detainee or a convicted prisoner, the United States

Constitution requires only that an inmate's serious medical needs not be met with *deliberate*

*indifference*.  See Thompson v. Upshur County, Texas, 245 F.3d 447, 457 (5th Cir. 2001); Harris

v. Hegmann, 198 F.3d 153, 159 (5th Cir. 1999).  On that point, the United States Fifth Circuit Court

of Appeals has explained:

> Deliberate indifference is an extremely high standard to meet. It is
> indisputable that an incorrect diagnosis by prison medical personnel does not suffice
> to state a claim for deliberate indifference.  Rather, the plaintiff must show that
> officials refused to treat him, ignored his complaints, intentionally treated him
> incorrectly, or engaged in any similar conduct that would clearly evince a wanton
> disregard for any serious medical needs.  Furthermore, the decision whether to
> provide additional treatment is a classic example of a matter for medical judgment.
> And, the failure to alleviate a significant risk that the official should have perceived,
> but did not is insufficient to show deliberate indifference.

Domino v. Texas Department of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001)  (quotation

marks, brackets, and citations omitted).  "Deliberate indifference encompasses only unnecessary and

wanton infliction of pain repugnant to the conscience of mankind." McCormick v. Stalder, 105 F.3d

1059, 1061 (5th Cir. 1997); see also Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999).

Further, it is clear that "[m]edical records of sick calls, examinations, diagnoses, and

medications may rebut an inmate's allegations of deliberate indifference." Banuelos v. McFarland,

41 F.3d 232, 235 (5th Cir. 1995).  The evidence in this case, in the form of plaintiff's voluminous

medical records[12] and Dr. Inglese's affidavit[13] and deposition testimony,[14] clearly shows that plaintiff's medical needs were continually and promptly addressed by the jail medical staff.  For example, Dr. Inglese, after reviewing the course of plaintiff's medical treatment at the jail, offered the following conclusions:

1. Mr. Zara had both an *Intake Medical Screening* and a full *Health Assessment* performed after he arrived at the St. Tammany jail.  These were performed in a timely fashion in accordance with NCCHC recommendations (National Commission on Correctional Health Care).

2. Following his arrest, Mr. Zara was prescribed medications appropriate for his chronic illnesses.  Moreover, he was seen by an internal medicine specialist soon after his incarceration.

3. Mr. Zara's hospitalization on 6/01/08 was *not* related to his fall the previous night.  His altered mental status was due to sinus and ear infections which had spread to his blood stream.  Mr. Zara had *not* submitted any sick calls complaining of sinus/ear-related symptoms prior to the hospitalization. Medical evaluated him as soon as we became aware ... of a problem, and he was routed to the hospital within hours.

4. After Mr. Zara returned from the hospital, jail physician's [sic] prescribed appropriate medications (as recommended by the hospital), and nurses administered those medications as ordered.  Mr. Zara was given considerable medical attention following his return from the hospital; he was seen at least *daily* in the medical clinic for nearly two weeks.  Finally, Mr. Zara recovered fully from the infections.

5. The jail medical staff responded rapidly each and every time Mr. Zara required medical attention, whether that need was an emergent problem or a routine request for medical services (such as a request for glasses).

---

[12]   Rec. Doc. 18-4.

[13]   Rec. Doc. 18-7.

[14]   Rec. Doc. 44-3.

9

6.    Mr. Zara was a very noncompliant patient.  He admitted to marked
      noncompliance with his diabetic medications at home.  Furthermore, he
      refused his blood pressure medications at jail.  Finally, he removed his IV
      catheter on two occasions, complicating administration of his antibiotics.

      ....

8.    On 6/21/08, Mr. Zara was in a physical altercation with another inmate.  He
      was promptly evaluated in the medical clinic after the event.  His vital signs
      were stable, and no serious injuries were apparent at the time.  In specific,
      there were no alterations in mentation or level of consciousness, and Mr.
      Zara was neurologically intact. Following the evaluation, he walked from the
      clinic without difficulty or assistance.  Moreover, Mr. Zara was seen in
      medical two days later and had no complaints. Finally, he did not submit any
      sick calls after the fight requesting medical attention nor did he report any
      problems to the nurse when she visited the dorm each day for medication
      pass.   In short, there was absolutely no indication that Mr. Zara had
      experienced a significant injury on 6/21/08 or during the subsequent few
      days.

9.    On 7/01/08, Mr. Zara was seen by a physician as soon as medical first
      became aware of a problem.  He had not submitted a sick call or requested
      attention from nurses or security staff.  The nurse noticed slurred speech
      during her routine duties on the dorm and ordered Mr. Zara to be taken for
      immediate evaluation.  I personally saw him at that time and was concerned
      over a possible stroke or some other intracranial event.  Therefore, I
      immediately routed him to the nearest hospital for further care.  He was sent
      emergently by ambulance.[15]

Plaintiff has offered no evidence to rebut the medical records or Dr. Inglese's conclusions; in fact,

he has offered no evidence at all in support of his bald allegations that his medical care failed to

meet constitutional standards.

In summary, there simply no evidence that plaintiff's serious medical needs were met with

deliberate indifference, much less any evidence to show the existence of an unconstitutional policy

---

[15]   Rec. Doc. 18-7, pp. 25-26.

or custom as required to support an official-capacity claim. Therefore, this Court cannot find that a genuine issue of material fact remains in dispute with respect to this issue. Accordingly, the defendant is entitled to summary judgment with respect to plaintiff's official-capacity claim that he was denied adequate medical care in violation of federal law.[16]

### B. Failure-to-Protect Claims

Plaintiff also asserts federal claims that he was not protected from harm while incarcerated within the St. Tammany Parish Jail. Specifically, he claims that he should have been protected against the alleged attacks of James Sylve on June 14, 2008, and Joseph Monnie on June 21, 2008.

It is clear that "the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including ... protection from harm, during their confinement." Hare v. City of Corinth, 74 F.3d 633, 650 (5th Cir. 1996) (en banc). However, as with a federal medical claim, a federal failure-to-protect claim is actionable only if there was deliberate indifference:

> To establish a failure-to-protect claim under § 1983, [an inmate] must show that he was incarcerated under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to his need for protection. In order to act with deliberate indifference, the official must both be aware of facts from which

---

[16]   That said, the Court notes that it takes a dim view of the decision to essentially dump plaintiff at the hospital where he was receiving treatment for the injuries he sustained while incarcerated. The defendant contends that plaintiff received a "Code 6" release on his own recognizance in order to prevent a drain on manpower at the jail; however, the Court is unconvinced that was the primary reason for the "Code 6" release. Rather, the Court suspects that the release was motivated by a hope to escape liability for any resulting medical bills. If that suspicion is well founded, such a practice of "dumping" inmates on a hospital for that reason is abhorrent. Nevertheless, the Court's distaste for such a practice does not make plaintiff's claim cognizable in federal court because there simply was no underlying constitutional violation in the instant case.

> the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Neals v. Norwood, 59 F.3d 530, 533 (5th Cir. 1995) (citations and internal quotation marks omitted). Moreover, "[d]eliberate indifference must be viewed from [the defendant's] perspective at the time in question, not with hindsight's perfect vision." Jackson v. Everett, 140 F.3d 1149, 1152 (8th Cir. 1998).

Again, the only defendant named with respect to these claims is Sheriff Strain in his *official capacity*. Therefore, as previously explained, plaintiff must be able to show that a *policy or custom* of Sheriff Strain was a "cause in fact" of the alleged violation. Here, plaintiff does not argue that he was harmed as the result of an *isolated* policy or custom implemented by Sheriff Strain. Rather, plaintiff argues that even if Sheriff Strain's policies and customs are constitutional when considered separately, they are nevertheless rendered unconstitutional by their *"cumulative effect."*

In support of that argument, plaintiff cites a recent decision of United States District Judge Helen G. Berrigan: Coker v. Strain, Civ. Action No. 08-678, 2010 WL 3922134 (E.D. La. Sept. 30, 2010). In that case, Jeremy Coker, an inmate at the St. Tammany Parish Jail, claimed that he was housed with and attacked by a more dangerous inmate, Joshua Saavedra. Coker sued, arguing that he should have been protected from Saavedra's attack. Judge Berrigan refused to dismiss the official-capacity claim against Sheriff Strain, finding that perhaps the cumulative effect of the Sheriff's policies was sufficient to support such a claim. Judge Berrigan reasoned:

> The Court now turns to Coker's claim against Sheriff Strain in his official capacity, that is, as the policymaker for the St. Tammany Parish Jail. It is apparent to the Court that the defendants' motion for summary judgment is based on a misunderstanding of Coker's claim. He claims that it is the *cumulative* effect of the jail's policies on classification and housing of inmates, understaffing, and monitoring

of inmates that amounted to deliberate indifference.  Defendants ignore the cumulative effect of these policies in favor of arguing that each of Coker's allegations standing alone would be insufficient to support relief.

For example, defendants assert that Coker had no constitutional right against being housed with Saavedra.  It is true that the classification of inmates is typically relegated to the broad discretion of prison officials.  Mikeska v. Collins, 900 F.2d 833, 836 (5th Cir. 1990); see also Stewart v. Thigpen, 730 F.2d 1002, 1005 (5th Cir. 1984); Smith v. Rabalais, 659 F.2d 539, 545 (5th Cir. 1981).  But that would still not excuse all housing decisions.  Here, the prison determined that Saavedra – a prisoner with a history of committing violent offenses like burglary and battery – was more dangerous than Coker and yet still housed them together.  It did not do so because it thought that was the safest course, but because it did not have the space to do otherwise.

The mere fact that they were housed together would probably not be sufficient to state a claim for deliberate indifference.  That is not what Coker claims in any event.  He asserts that the prison officials demonstrated deliberate indifference to his well-being by adopting policies that house him with a more dangerous inmate like Saavedra, *and* house them together in a building with a security system that made it easier for inmates to start fights undetected (all the while knowing that inmates were aware of the security system's defects and took advantage of them), *and* then having too few staff on hand to respond promptly to a fight.

So, contrary to defendants' characterization of his complaint, Coker does not claim an unqualified right to have "every square inch" of any given prison monitored by video at all times.  A prison filled only with minimum-security inmates might well get by with quite relaxed inmate monitoring.  Or, a prison filled with more dangerous inmates might get by with the type of security system installed in C-Building if it has sufficient staff to break up any fights before a prisoner is seriously injured.  Or, a prison with inmates of mixed security classifications might get by with the security system and staffing levels present in C-Building so long as the inmates are not aware of the security system's vulnerabilities.  Coker does not dispute any of this.  Instead, he asserts that the St. Tammany Parish Jail could not constitutionally get by with problems in all three areas.

Coker, 2010 WL 3922134 at *5-6 (record citations omitted).

In the instant case, Sheriff Strain questions the soundness of the "cumulative effect" analysis employed in Coker.  Nevertheless, even if the "cumulative effect" analysis is legally sound, which is an issue this Court need not reach, plaintiff is not aided because his case is factually distinguishable.

13

First and foremost, there is no evidence to support the contention that Sylve and Monnie were known to pose a danger to other inmates such as plaintiff.  As an initial matter, the Court notes that the evidence does not support plaintiff's attempts to portray himself as particularly vulnerable milquetoast detained on "a non-violent misdemeanor charge."[17]  Plaintiff was in fact charged with a felony, i.e. fourth offense driving while intoxicated, and was detained because his bond had been revoked after he failed to appear for his court date.[18]  Moreover, while the parties seem to dispute the relative security classifications of plaintiff, Sylve, and Monnie, that dispute is not determinative because it essentially misses the point.  Warden Longino made clear in his deposition that an assessment of the *security risk* posed by an inmate is not necessarily an assessment of the inmate's *dangerousness;* rather, those two issues are in some respects distinct,[19] and it is solely the dangerousness of Sylve and Monnie which is pertinent here.  On that point, there is simply no evidence before the Court indicating that Sylve and Monnie posed known dangers to any other inmates including plaintiff.  Specifically, there is no evidence whatsoever that, prior to these incidents, Sylve and Monnie had threatened plaintiff, were known enemies of plaintiff,[20] or had previously threatened or attacked any other inmates.

---

[17]   Rec. Doc. 1, p. 5.

[18]   Rec. Doc. 18-8.

[19]   Rec. Doc. 44-2, pp. 26 and 121-25.

[20]   To the contrary, plaintiff admitted in his deposition that had never had any problems with either Sylve or Monnie prior to these incidents.  Rec. Doc. 45-1.

Second, the <u>Coker</u> decision was based in large part on evidence showing that the video surveillance system was plagued with known "blind spots" where violence could take place unobserved. That was crucial with respect to the issue of causation in <u>Coker</u>, because Saavadra expressly admitted that he attacked Coker in one of those blind spots in order to avoid detection. <u>Coker</u>, 2010 WL 3922134, at *2. However, in the instant case, the existence of the blind spots has no direct relevance, in that, as even plaintiff admits,[21] there is no evidence whatsoever that the incidents involving Sylve and Monnie occurred in such a blind spot or that purported defects in the video surveillance system played a part in the incidents here.

Simply put, regardless of whether the St. Tammany Parish Jail policies and customs are considered individually, as Sheriff Strain suggests, or cumulatively, as plaintiff suggests, *there is no evidence that those policies and customs*, even if theoretically subpar in some respect, *were a "cause in fact" of the alleged attacks.* In other words, plaintiff has presented no evidence whatsoever that the policies or customs "served as a moving force behind the constitutional violation at issue or that [his] injuries resulted from the execution of an official policy or custom." <u>Spiller v. City of Texas City, Police Department</u>, 130 F.3d 162, 167 (5th Cir. 1997). Therefore, his federal official-capacity failure-to-protect claims necessarily fail.[22]

---

[21]    Rec. Doc. 44, p. 10.

[22]    Moreover, the Court notes that plaintiff's claims seemed to be based on a premise that prison administrators are at fault for random attacks unless they have taken all conceivable precautions to ensure the absolute safety of all inmates regardless of the actual likelihood of serious harm. That is not the law. While prison officials must clearly make reasonable efforts to formulate policies to provide a safe environment, they simply cannot ensure that all inmates will at all times be absolutely safe from random, unanticipated attacks. To require such "absolute safety" would ask the impossible of prison administrators:

> [I]t is doubtful that inmate against inmate violence can ever be prevented within a prison setting no matter how carefully a prison might be operated. Courts must

## IV.  State Law Claims

Finally, the Court notes that plaintiff also indicates in the complaint that he is asserting claims under state law.  However, in that plaintiff's federal claims are being dismissed, it is appropriate for the Court to decline to exercise supplemental jurisdiction over any state law claims. See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction."); see also Jackson v. Mizzel, 361 Fed. App'x 622, 627 (5th Cir. 2010) ("Because [the plaintiff] states not one valid federal claim, the district court properly declined jurisdiction over his Louisiana causes of action."); Bass v. Parkwood Hospital, 180 F.3d 234, 246 (5th Cir. 1999) ("When a court dismisses all federal claims before trial, the general rule is to dismiss any pendent claims.").[23]

Accordingly,

**IT IS ORDERED** that the motion for summary judgment is **GRANTED**.

---

comprehend the magnitude of the prison administrators' problem and recognize the distinctly unique situation caused by confining human beings in a tension-filled atmosphere.  Inmate assaults upon inmates are not unusual in the best run prisons.

Campbell v. Anderson, 335 F.Supp. 483, 486 (D. Del. 1971); see also Farmer v. Brennan, 511 U.S. 825, 858-59 (1994) (Thomas, J., concurring) (noting that "[p]risons are necessarily-dangerous places" which "house society's most antisocial and violent people in close proximity with one another" and that "some level of brutality ... among prisoners is inevitable no matter what the guards do unless all prisoners are locked in their cells 24 hours a day and sedated") (quotation marks, brackets, and ellipsis omitted).

[23]    The Court expressly declines plaintiff's invitation to retain jurisdiction to resolve his state law claims.  Plaintiff is not significantly harmed by requiring him to pursue his state claims in state court, in that the limitations period for such claims was tolled during the pendency of this proceeding, see 28 U.S.C. § 1367(d), and in that his discovery and efforts in this Court will aid him in pursuing his claims in state court.  Because plaintiff lacked a viable federal claim, he should have filed his claims in state court, and he is not prejudiced by a requirement that he do now what he should have done originally.

**IT IS FURTHER ORDERED** that plaintiff's federal law claims are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that plaintiff's state law claims are **DISMISSED WITHOUT PREJUDICE**.

New Orleans, Louisiana, this twenty-second day of February, 2011.

**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**